CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

**March 04, 2024**
LAURA A. AUSTIN, CLERK
BY:
    /s/T. Taylor
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| GEORGE ZACHARY SCHUPPAN, | ) | |
| Petitioner, | ) | Civil Action No. 7:22-cv-00733 |
| | ) | |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| BETH CABELL, WARDEN, *et al.*, | ) | United States District Judge |
| Respondents. | ) | |

**MEMORANDUM OPINION**

George Zachary Schuppan, by counsel, filed this petition for a writ of habeas corpus, 28

U.S.C. § 2254, challenging his 2016 conviction and life sentence for first degree murder.

(Habeas Pet., Dkt. No. 1.)  Before the court is respondents' motion to dismiss.  (Dkt. No. 13.)

For the reasons stated below, respondents' motion will be granted.

I.  BACKGROUND

**A.  Procedural Background**

Schuppan was tried by a jury in the Circuit Court of Page County in a joint trial with his

father, George Harold Schultz, for the murder of Schultz's wife (Schuppan's stepmother).  After

the trial, the circuit court convicted Schuppan of first-degree murder, conspiracy to commit first-

degree murder, concealing a dead body, and use of a firearm in the commission of a felony.

(Resp't's Ex. 1, Dkt. No. 15-1.)  The court sentenced Schuppan to life imprisonment plus

eighteen years and a $100,000 fine, in accordance with the jury's recommendation.  (Resp't's

Ex. 2, Dkt. No. 15-2.)

The Court of Appeals of Virginia denied Schuppan's appeal on December 1, 2016.

(Resp't's Ex. 3, Dkt. No. 15-3.)  Then, on August 29, 2017, Schuppan's appeal was refused by

Supreme Court of Virginia.  (Resp't's Ex. 4, Dkt. No. 15-4.)  On August 23, 2018, Schuppan, by

counsel, filed a petition for a writ of habeas corpus in the Circuit Court of Page County.

(Resp't's Ex. 5, Dkt. No. 15-5.)  On July 9, 2021, the circuit court judge who presided over the

trial issued an eleven-page letter opinion finding that there were "no *Brady*, *Giglio*, or *Napue*

violations by the Commonwealth, [Schuppan's] right to the effective assistance of counsel was

not violated, and Defense counsel's specific assistance was not ineffective."  (Resp't's Ex. 6,

Dkt. No. 15-6.)  The court dismissed Schuppan's petition by final order dated February 23, 2022.

(Resp't's Ex. 7, Dkt. No. 15-7.)[1]

Schuppan appealed to the Supreme Court of Virginia, which summarily affirmed on

December 16, 2022.  (Ex. Nos. 8, 9, Dkt. Nos. 15-8, 15-9.)

**B.  Pertinent State Court Findings of Fact**

The presiding circuit court judge made the following factual findings in denying

petitioner's state habeas petition:

> Joy Schultz, a local woman married to George Schultz, went missing
> over the weekend of September 6, 2014.  She was last seen on
> Friday, September 5, 2014, at her employment.  The day before on
> September 4, 2014, she changed the beneficiaries on her life
> insurance policies totaling about $220,000.00 with Human
> Resources to have her brother be the main beneficiary instead of her
> husband.  (There was no evidence that anyone else knew of this
> beneficiary change made shortly before her disappearance.)  On
> September 5, 2014, she indicated to some co-workers who were
> friends that she needed to talk to them about something important
> (perhaps involving her plan to end her relationship with Schultz) and
> would call them later.  She never did.  She did not report to work on
> Monday which was very unusual.  On the morning of Tuesday,
> September 9, 2014, coworkers called law enforcement to conduct a
> welfare check.
>
> Law enforcement received the call at 7:34 a.m. on September 9,
> 2014.  A deputy happened to be nearby and responded to her home

---

[1]  The order is signed and dated February 23, 2021, but the court presumes that this must be a clerical error.
(Dkt. No. 15-7 at 24 of 26.)  The order references the court's findings dated July 9, 2021.  (*Id.* at 5 of 26.)  The order
provided to the court has a "RECEIVED" date stamp of March 3, 2022, by the Office of the Attorney General.  (*Id.*
at 1 of 26.)

at 7:50 a.m. in Page County where her husband, George Schultz, and her stepson, George Zachary Schuppan, were present.  Both lived at the residence.  Schuppan had recently located her father whom he had not seen since he was a child due to Schultz's participation in the federal witness protection program after he provided testimony in cases involving the biker gang that he was a longtime member of in previous years.  Both Schuppan and Schultz were very degrading and abusive toward Joy and it was overwhelming to her to the point that she planned on leaving her residence.

When initially questioned by an officer of the Page County Sheriff's Office on September 9, 2014, after Joy's co-workers had reported her missing, both [Schuppan] and his father lied and claimed to not know her whereabouts.  In fact, Joy was murdered by Schultz and Schuppan by shooting her multiple times with a .45 handgun on September 6, 2014, in her residence.  They then partially eviscerated and dissected her body before burying her in a shallow grave in a nearby National Forest.

The officers who investigated Joy's disappearance on September 9, 2014, observed a fire in the fire pit outside the residence.  This was the area where the furniture that Joy was seated on when shot, along with other associated items related to the murder, were destroyed. Schultz and Schuppan did not allow law enforcement access to the home on this date.  The next day, September 10, 2014, investigators from the Page County Sheriff's Office arrived at the residence and this time Schultz and Schuppan allowed a consensual search of the residence.  Law enforcement also noticed that the basement smelled strongly—almost overwhelmingly—of bleach.  There were signs that the floor of one room had been recently scrubbed clean while the rest of the house was filthy.  During a consensual search of the house, law enforcement found numerous firearms in Schuppan's bedroom.  They also found a medical book on human anatomy and physiology in Schuppan's bedroom.  They also found a book entitled "On Killing: The Psychological Cost of Learning to Kill in War and Society."  They also found a handwritten booklet written by Schuppan containing recipes for various poisons used to kill people.

Joy was missing for forty-six days during which authorities continued to investigate the circumstances of her disappearance. During this entire time, Schultz and Schuppan continued to lie by maintaining that they had no knowledge of Joy's whereabouts.  It was suggested by them that perhaps the biker gang that Schultz was previously associated with carried out a retaliatory "hit" on Joy to punish Schultz for his testimony for the federal government.  On

3

October 22, 2014, the Page County Sheriff's Office charged Schultz with possession of a firearm after being convicted of a felony. This was a breaking point in the case as Schultz then told law enforcement that he could take them to Joy's body. He told authorities that Schuppan had shot Joy multiple times because they argued frequently and Schuppan was hostile toward her and wanted her to move out.

Schultz took officers to the location of Joy's body in a shallow, partially exposed grave in the Shenandoah National Park. Her body was wrapped in three tarps. Both arms had been cut off below the elbows and her hands were missing, much of her face and jaw was missing and some internal organs had been removed and the body cavity stuffed with rocks and debris. The body was identified by DNA from a tooth as there were no hands for fingerprints (and decomposition would have rendered that futile) or an intact dental structure for dental record identification.

Schuppan was then arrested and almost immediately indicated that he "wanted a deal." He told law enforcement that he came home from work to find that his father had shot Joy with Schuppan's handgun and that his father had threatened him at gunpoint, demanding that Schuppan assist in concealing the body. He indicated that he had been uncooperative in the time Joy was missing because he was afraid of his father and his connections to biker gangs. However, he was confronted in his testimony with many instances over the course of the forty-six-day search where he could have communicated freely with law enforcement outside of the presence of Schultz but did not. Schuppan, however, indicated that his lies were in fact threaded with discrete attempts to "passively communicate" with law enforcement from his position as a victim/unwilling participant (even in conversations when his father was not present). At other points, he indicated this failure to be truthful was because he felt "stereotyped and profiled" by the police and was intimidated by them.

One witness called by the Commonwealth was Chad Woodward. Woodward had been Schuppan's cellmate while Schuppan was awaiting trial in the Page County Jail. Woodward testified that Schuppan told him he shot Joy as part of a plan to collect on Joy's life insurance policy from her employer which carried a death benefit in excess of $220,000.00. After an altercation with Schuppan, Woodward was moved to a regional jail where he became acquainted with Schultz who was housed there to be separate from Schuppan. Schultz told Woodward that Schuppan had shot Joy and that they planned to split the insurance money. Another

4

inmate, Lavar Johnson, testified that he heard Schuppan tell
Woodward that he killed Joy because she wanted him to move out
of the house and was supposed to share $200,000.00 from the life
insurance with someone.

(Resp't's Ex. 6 at 4–8, Dkt. No. 15-6.)

## II.  ANALYSIS

### A.  Petitioner's Claims

Petitioner alleges the following claims: (1) the Commonwealth presented and failed to

correct material testimony which it knew, or ought to have known, to be false (*Napue* and *Giglio*

claim); and before and at trial, the Commonwealth failed to disclose exculpatory evidence to

counsel, in violation of due process (*Brady* claim); (2) violation of right to effective assistance of

loyal counsel, due to Commonwealth engaging a confidential informant (Woodward) to intercept

communications petitioner intended to share with counsel; all the lawyers appointed to represent

petitioner had also represented (either concurrently or in the past) Woodward, a material

Commonwealth informant and witness, creating conflicts of interest; and trial counsel Richard

Morgan created a conflict between his own interest and his professional responsibilities to

petitioner; and (3) ineffective assistance of counsel by Morgan for failing to investigate the

Commonwealth's favorable treatment to Woodward on his probation violations which occurred

while petitioner's case was pending; failing to investigate that Woodward was ordered to have a

mental health evaluation; failing to discover or disclose that he had represented Woodward in the

past; and failing to object to having a joint trial with Schultz.  (*See* Habeas Pet.)

### B.  Exhaustion and Procedural Default

A state prisoner must exhaust his remedies in state court before seeking habeas corpus

relief in federal court.  28 U.S.C. § 2254(b).  A federal court "may not grant a writ of habeas

corpus to a petitioner in state custody unless the petitioner has first exhausted his state remedies

by presenting his claims to the highest state court." *Baker v. Corcoran*, 220 F.3d 276, 288 (4th Cir. 2000). Further, the petitioner must present to the state court the same operative facts and the same controlling legal principles that he seeks to present to the federal court. *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995); *Kasi v. Angelone*, 300 F.3d 487, 501–02 (4th Cir. 2002). Failure to do so "deprive[s] the state court of an opportunity to address those claims in the first instance." *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). A petitioner must also present his federal claims to the appropriate state court in the manner required by the state court, so as to give the state court "a meaningful opportunity to consider allegations of legal error." *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986). A state prisoner does not "fairly present" a claim for exhaustion purposes when the claim is raised in "a procedural context in which its merits will not be considered." *Castille v. Peoples*, 489 U.S. 346, 351 (1989).

"A claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court." *Baker*, 220 F.3d at 288; *see Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998) (describing the procedural default doctrine as a "distinct but related limit on the scope of federal habeas review"). Simultaneous exhaustion and procedural default occurs "when a habeas petitioner fails to exhaust available state remedies and 'the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Breard*, 134 F.3d at 619 (quoting *Coleman*, 501 U.S. at 722). In that case, "the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Baker*, 220 F.3d at 288.

Respondent argues that petitioner's claim in ground two of his petition—that the Commonwealth interfered with his relationship with counsel by using Woodward as a confidential informant to intercept communications—is procedurally defaulted.  The state habeas court found that "Shuppan could have raised this non-jurisdictional issue at trial and on direct appeal and, thus, it is barred from review in a petition for a writ of habeas corpus."  (Resp't's Ex. 7 at 6 (citing *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974).)  *Parrigan* provides that a "petition for a writ of habeas corpus may not be employed as a substitute for an appeal or a writ of error."  "A prisoner is not entitled to use habeas corpus to circumvent the trial and appellate processes for an inquiry into an alleged non-jurisdictional defect of a judgment of conviction." 205 S.E.2d at 682.  The Fourth Circuit has recognized *Parrigan* as an independent and adequate state law ground that precludes federal review.  *See Lewis v. Wheeler*, 609 F.3d 291, 309 (4th Cir. 2010).

In response, petitioner argues that that the state habeas court mischaracterized his claim as involving prosecutorial misconduct, or an absolute denial of the Sixth Amendment right to counsel.  Instead, the claim involved interference with the effective right to counsel, which is recognized as a species of an ineffective assistance claim.  *See United States v. Cronic*, 466 U.S. 545, 658–60 (1984).  Such a claim is not cognizable on direct review in state court.  *See Lenz v. Commonwealth*, 544 S.E.2d 299, 304 (Va. 2001) ("Claims raising ineffective assistance of counsel must be asserted in a habeas corpus proceeding and are not cognizable on direct appeal.").  Thus, *Parrigan* may not be an adequate and independent state law ground precluding federal review of this claim in these circumstances.  Nonetheless, it is not necessary for the court to resolve this issue because, as discussed below, the state habeas court addressed this claim on the merits, and the state court's ruling survives AEDPA review.

7

## C.  Merits Standard of Review

Pursuant to § 2254(d), "a petitioner is entitled to relief only the state court adjudication of their claim was [1] 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court'; or [2] 'based on an unreasonable determination of the facts in light of the evidence presented.'"  *Allen v. Stephan*, 42 F.4th 223, 246 (4th Cir. 2022) (quoting 28 U.S.C. § 2254(d)).  "The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply *de novo* review to factual findings and to substitute its own opinions for the determinations made on the scene by the trial judge."  *Davis v. Ayala*, 576 U.S. 257, 276 (2015).

"Clearly established Federal law" for purposes of § 2254(d)(1) includes only "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions."  *White v. Woodall*, 572 U.S. 415, 419 (2014).  "A state court's decision is 'contrary to' clearly established federal law under § 2254(d)(1) when it 'arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law' or 'decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'"  *Allen*, 42 F.4th at 246 (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)).  A state court's decision is an "unreasonable application" of clearly established federal law if the state court correctly identified the governing legal principle but "'unreasonably applie[d] that principle to the facts of the prisoner's case.'"  *Id.* (quoting *Williams*, 529 U.S. at 413).  This standard is meant to be "difficult to meet."  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  "'The ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice.'"  *Allen*, 42 F.4th at 246 (quoting *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017)).  The petitioner "must show that the state court's ruling was so

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

A state court's factual determinations, meanwhile, "are presumed correct, and the petitioner must rebut this presumption by clear and convincing evidence." *Allen*, 42 F.4th at 246 (citing 28 U.S.C. § 2254(e)(1)). A state court's decision is based on an "unreasonable determination of the facts in light of the evidence presented" under § 2254(d)(2) when it is "'sufficiently against the weight of the evidence that it is objectively unreasonable.'" *Id.* (quoting *Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010)). "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Wood v. Allen*, 558 U.S. 290, 301 (2010) (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is "especially so" when the state court "resolved issues like witness credibility." *Id.* (quoting *Cagle v. Branker*, 520 F.3d 320, 324–25 (4th Cir. 2008)). Credibility judgments may be overturned only when the error is "stark and clear." *Id.*

Even if a petitioner meets his burden under § 2254(d) and establishes the state court erred, "habeas relief will not be granted unless the error had substantial and injurious effect or influence in determining the jury's verdict" or there is at least "grave doubt as to the harmlessness" of the error. *Allen*, 42 F.4th at 246–47 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), and *Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002) (internal quotation marks omitted)).

In determining whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law, the court looks to the last reasoned state court opinion.  *See Lewis v. Clarke*, CASE NO. 7:20CV00421, 2021 WL 1541034, at *5 (W.D. Va. Apr. 20, 2021) ("On habeas review, a federal court is to 'look through' the summary decision to the last court decision providing a rationale for the merits decision and to presume that the state high court adopted the same reasoning.") (citing *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018)). In this instance, the relevant opinion and findings of fact are from the presiding trial judge in Page County Circuit Court.  (*See* Resp't's Exs. 6, 7.)

### 1. *Napue*, *Giglio*, and *Brady* claims (ground one)

Schuppan argues that the Commonwealth violated his rights under *Brady* when it failed to disclose that Woodward had received favorable treatment in consideration for his testimony against Schuppan and that Woodward had been ordered to have a mental health evaluation. (Habeas Pet. 7–8.)  Under *Brady v. Maryland*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."  373 U.S. 83, 87 (1963).  To demonstrate a *Brady* violation, a petitioner must "show that the undisclosed evidence was (1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense . . .; and (3)" suppressed. *United States v. Wilson*, 624 F.3d 640, 661 (4th Cir. 2010).

Schuppan further argues that Woodward testified falsely that he had received no favorable treatment in exchange for testifying against Schuppan and that the Commonwealth failed to correct Woodward's testimony, in violation of *Napue* and *Giglio*.  (Habeas Pet. 5–8.)  In *Giglio*, the Supreme Court held that "[i]mpeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule."  *Giglio v. United States*, 405 U.S. 150, 154 (1972).  "Such evidence

is evidence favorable to the accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Id.* A *Napue* violation occurs when the prosecution knowingly elicits false or misleading testimony or allows such testimony to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). To establish a *Napue* violation, a petitioner must show that (1) the testimony was false or misleading, (2) the prosecution knew the testimony was false or misleading, and (3) the testimony was material. *Basden v. Lee*, 290 F.3d 602, 614 (4th Cir. 2002).

With respect to these claims, the state habeas court found that they are "refuted by the record and by the Commonwealth Attorney's affidavit, and even on their face, they are based on bare speculation." (Resp't's Ex. 7 at 7.)

> As an initial matter, this Court holds that Schuppan has failed to meet the threshold requirement of demonstrating that the Commonwealth failed to disclose any favorable evidence. Instead, Schuppan has merely *speculated* that there was a prior agreement between Woodward and the Commonwealth wherein Woodward had received or would receive favorable treatment in exchange for his testimony against Schuppan. Such speculation fails to meet his burden of proof and alone requires the dismissal of claim (a).
>
> Schuppan does not offer any affidavits from his trial attorneys that aver that the Commonwealth withheld information regarding Woodward's past and pending probation violations. Instead, Schuppan merely offers supposition: "The timing of Woodward's testimony, however, and the treatment of his probation violations by the Commonwealth, *strongly indicate* that Woodward *did* receive favorable treatment in exchange for his being a confidential informant and giving testimony against me." Then, without any factual support or attribution as to the source of his conclusion, Schuppan asserts that Woodward was permitted to enter a Diversion program in November 2014 "in return for the information he provided to investigators" that same month. And, again, without any evidentiary support, Schuppan asserts that the Commonwealth did not disclose to trial counsel that Woodward entered into a Diversion program in 2014.
>
> Second, and again without support, Schuppan also asserts that the

Commonwealth did not disclose to trial counsel that, at a June 2015 revocation hearing four months before Schuppan's trial, Woodward's suspended sentence had been revoked and re-suspended on the condition that he complete the Geimenshaft Program and "have a mental evaluation with Community Service Board." Schuppan asserts that this outcome was consideration in anticipation of Woodward's testimony against Schuppan at trial.

However, this Court holds that the prosecutor's statements at the probation revocation do not demonstrate that the Commonwealth had promised Woodward leniency in exchange for his testimony; rather, the prosecutor's statements demonstrate that the Commonwealth wanted to place Woodward in Geimenshaft because there was a "safety issue" should Woodward be incarcerated. At that point, Woodward was known as a "snitch" by prisoners, not because he was going to testify at Schuppan's trial, but because newspapers had reported that law enforcement officers had obtained a search warrant based on Woodward's statements to law enforcement officers that were obtained after he told the jail guard why he and Schuppan could no longer share a cell. The prosecutor made clear that he was not recommending Geimenshaft as part of an agreement; but rather he stated that "we have to do it" due to the "safety issue."

Finally, Schuppan also asserts that "[t]he timing [of the Commonwealth's motion to nolle prosequi other probation violations four days after Schuppan's trial] makes it highly implausible that these dismissals were not directly related to Woodward's giving testimony against [Schuppan]." However, once again, Schuppan offers no evidence that there actually was an agreement and no evidence that the Commonwealth did not disclose to trial counsel that Woodward had probation violations pending.

In any event, Schuppan's allegations are categorically denied by the prosecutor, whom this Court finds credible. First, Mr. Alger avers that his office "maintained an open file with defense counsel through the entirety of the proceedings," and that Mr. Alger spoke with trial counsel "on an almost weekly basis regarding any new issues as they developed in the case." Mr. Alger states that he "recall[ed] several conversations that I had with defense counsel regarding Mr. Woodward's convictions, criminal history, subsequent probation violations, and outcomes of these matters." Moreover, Mr. Alger permitted trial counsel "to review Woodward's file in its entirety."

Second, Mr. Alger avers that there was no agreement with Woodward prior to his testimony on October 19, 2018. Specifically,

with respect to Woodward's November 24, 2014 placement in a Diversion program, Mr. Alger denies that it was a benefit offered to Woodward in exchange for his assistance; states that this disposition was the typical resolution for a probation violation; and avers that it was disclosed to trial counsel.  Mr. Alger states that Woodward's June 10, 2015 enrollment in the Geiminshaft Program "was an appropriate disposition for Woodward given his past history of drug use," and he avers that this resolution was discussed with trial counsel and that trial counsel cross-examined Woodward regarding that disposition.  Finally, Mr. Alger denies that there was an agreement that the Commonwealth would dismiss Woodward's pending probation violations on October 26, 2015, after Woodward testified against Schuppan.  Mr. Alger avers that the charges were dismissed "because Mr. Woodward had been exposed to danger in the process of the trial as a result of actions of the Commonwealth, [i.e.,] his name was released in a search warrant and published in a newspaper."  Mr. Alger further states that the disposition [w]as appropriate because Woodward had been threatened and attached by other inmates.  Furthermore, Mr. Alger avers that he disclosed the court date for this violation hearing to trial counsel prior to Schuppan's trial.

This Court holds that Mr. Alger's affidavit is corroborated by trial counsel's statements at trial and by Woodward's own testimony. First, prior to Woodward's testimony, trial counsel told this Court that he had seen Woodward's "most recent criminal history, . . . recent as of a few days ago."  Next, Woodward admitted during his testimony that he was incarcerated at the time of Schuppan's trial for a probation violation and explicitly stated twice that he had not been "promised or any agreements been made concerning what's going to happen to [him] concerning" that violation.  Woodward gave details about the reasons for his incarceration, testifying that when Schuppan was first placed in his cell block, Woodward was incarcerated for a "technical violation" of his probation.  Woodward further testified that between speaking with Investigator Roy "and coming to Court" he "had been sentenced to Diversion."  Woodward also admitted that he was "kicked out of Diversion" and then sentenced for that violation of his probation after he had begun cooperating with the Commonwealth but prior to Schuppan's trial.

Moreover, Woodward repeatedly testified that he *did not* want to testify at Schuppan's trial.  In fact, Woodward initially declined to speak to investigators about Schuppan's confession, but eventually did cooperate because "what's right and what's wrong."  Woodward told the investigators, "[I]f possible I don't wanna be in it anymore. I don't want any kind of contact about any of this."  Woodward

stated that the newspapers reported that he had been named in the search warrant application and that fellow inmates then assaulted him as a snitch.  He stated that he had to "live with it over there at the jail" that his cooperation with the Commonwealth had been publicized.

Ultimately, Woodward stated that he was testifying at Schuppan's trial because "right is right and wrong is wrong."  Woodward said that he would not be testifying if Schuppan had committed a petty crime, because Woodward faced name calling and physical abuse, but Woodward was testifying and "swallow[ing] [his] pride" and being a snitch due to the serious nature of Schuppan's crimes.

This Court finds that the gravamen of Woodward's testimony was that he expected to go back to jail and face more abuse after testifying Schuppan, but he felt compelled to testify nonetheless.  On October 19, 2015, Woodward stated,

> I didn't even know if I was gonna testify up until ten . . . minutes before walking in here.  I had mixed feelings about the whole scenario.  I'm pretty sure you can ask the Commonwealth, I've told my lawyer, I told [Investigator] Roy, dealing with the fights and dealing with the reputation that's been given to me, I don't want to do it.  I had, nothing is in my favor as far as to do this, other than what I felt was right and what was wrong.

In response, Schultz's counsel asked Woodward, "You don't think you have anything to gain?", and Woodward responded, "No."

(Resp't's Ex. 7 at 9–13.)  These findings, including the determination that the prosecutor's affidavit was credible,[2] was not based on an unreasonable determination of facts.  As noted above, credibility judgments can only be overturned when the error is "stark and clear."  *Sharpe*, 593 F.3d at 378.  There is no such error here.

The state court went on to analyze the *Brady*, *Giglio*, and *Napue* claims:

---

[2]  *See* Resp't's Ex. 10, Dkt. No. 15-10, Affidavit of the Honorable Kenneth L. Alger, III.  Alger has since been appointed to a judgeship on Page County General District Court.

> Thus, this Court holds that Schuppan's *Brady* claim . . . fails on multiple fronts.  This Court holds that there was no agreement between the Commonwealth and Woodward, and the Commonwealth disclosed all relevant information regarding Woodward to trial counsel . . . .  The information regarding Woodward's past and pending charges was publicly available . . . .  And where Woodward testified at length regarding his probation violations and the dispositions he received, the purportedly exculpatory information was disclosed to counsel at such a time that could have been used . . . .
>
> This Court holds that Schuppan's *Napue* claim meets the same result, as, for all the reasons discussed above, he has failed to demonstrate by the preponderance of the evidence that Woodward testified pursuant to an agreement with the Commonwealth or that he received favorable treatment for his testimony . . . .

(Resp't's Ex. 7 at 13–14 (internal citations omitted).)  The court also noted in its findings that these claims "make up a relatively small portion of the overall case.  The evidence was voluminous and overwhelming—making issues with this jailhouse informant arguably immaterial."  (Resp't's Ex. 6 at 10–11.)  This analysis was not contrary to, or an unreasonable application of, the precedents set forth in *Brady*, *Giglio*, or *Napue*.  As the state court explained in great detail, there was no failure to disclose exculpatory or impeachment evidence, and neither was false or misleading testimony elicited because the informant did not testify pursuant to an agreement with the Commonwealth.  Moreover, no prejudice ensued because of the other evidence of guilt, which was considered "voluminous and overwhelming."  *See United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015) (explaining that a finding of materiality in a *Brady* claim requires a reasonable probability that the evidence would have produced a different result).

For these reasons, the court will grant the motion to dismiss this claim.

### 2.  Ineffective assistance of counsel (grounds two and three)

When a state prisoner seeks § 2254 relief for ineffective assistance of counsel, courts apply the "highly deferential" *Strickland* standard.  *Owens v. Stirling*, 967 F.3d 396, 412 (4th

Cir. 2020).  In *Strickland*, the Supreme Court set forth a two-part test to evaluate ineffective assistance of counsel claims.  First, the petitioner must show counsel's performance was deficient and fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 687–88.  Second, the petitioner must show prejudice, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  Counsel gets the strong presumption that he or she rendered "adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Burt v. Titlow*, 571 U.S. 12, 22 (2013).

"AEDPA and *Strickland* thus provide 'dual and overlapping' lenses of deference, which we apply 'simultaneously rather than sequentially.'"  *Owens*, 967 F.3d at 411.  "This double-deference standard effectively cabins our review to a determination of whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Morva v. Zook*, 821 F.3d 517, 528 (4th Cir. 2016).  "Section 2254(d) codifies the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.  Thus, surmounting *Strickland*'s high bar is never an easy task.  But establishing that a state court's application of *Strickland* was unreasonable under 2254(d) is all the more difficult."  *Valentino v. Clarke*, 972 F.3d 560, 580 (4th Cir. 2020) (internal citations omitted).

First, Schuppan argues that the Commonwealth interfered with his right to the effective assistance of counsel by engaging a confidential informant (Woodward) to intercept communications he intended to share with counsel in confidence.  As noted above, respondents argue that this claim was procedurally defaulted.  To the extent that *Parrigan* does not constitute

an adequate and independent state law ground precluding federal review, the state court

addressed the merits of the claim as follows:

> And, in any event, this Court holds that Schuppan has failed to
> support his claims of prosecutorial misconduct with anything other
> than his self-serving allegations.  He has offered no transcript
> citations or other evidence to support his allegation that the
> Commonwealth "engag[ed]" Woodward to "intercept
> communications I intended to share confidentially with counsel."
> The evidence at trial belies this assertion.  First, Sergeant James Roy
> testified that Woodward "was not intentionally placed [in the same
> jail block with either Schultz or Schuppan] by anybody involved . .
> . the investigation."  Moreover, the lead prosecutor, the Honorable
> Kenneth L. Alger, II, avers, "At no point, did the Commonwealth or
> any of her agents intentionally place[] Woodward in the same cell
> with the Petitioner in the hopes of gaining information."  And
> Woodward testified that he only revealed that Schuppan had
> confessed to the murder when a guard at the jail asked him why
> Schuppan needed to be moved from Woodward's cell.  This guard
> relayed Woodward's account to other law enforcement officers.

(Resp't's Ex. 7 at 6–7.)

Schuppan frames this claim as arising under the Supreme Court's ruling in *United States
v. Cronic.*  In *Cronic*, the Court found that courts may presume prejudice when evaluating claims
for ineffective assistance of counsel when there are "circumstances that are so likely to prejudice
the accused that the cost of litigating their effect in a particular case is unjustified."  466 U.S. at
658.  The Court pronounced three exceptions to *Strickland* that permit the presumption of
prejudice: (1) when there has been a "complete denial of counsel," because "a trial is unfair if the
accused is denied counsel at a critical stage of his trial"; (2) if counsel "entirely fails to subject
the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth
Amendment rights that makes the adversary process itself presumptively unreliable"; and (3)
"when although counsel is available to assist the accused during trial, the likelihood that any
lawyer, even a fully competent one, could provide effective assistance is so small that a

presumption of prejudice is appropriate without inquiry into the actual conduct of the trial."
*Cronic*, 466 U.S. at 659–60.  Schuppan does not articulate which exception should apply in this
instance.  In any event, as a factual matter, the state court simply found that Schuppan's claim
about intercepting communications intended for counsel was not true.  This was not an
unreasonable determination of the facts, and to the extent that Schuppan is attempting to
shoehorn this scenario into a claim under *Cronic*, his claim lacks any factual basis.

Schuppan argues that the "close temporal connection" between Woodward becoming his
cellmate, Woodward reviewing a confidential statement Schuppan prepared for his lawyer, the
Commonwealth informing Schuppan's counsel that Woodward was a confidential informant and
a likely Commonwealth witness in Schuppan's case, and the withdrawal of Schuppan's counsel
"indicates that agents for the Commonwealth knew that at the time Mr. Herr represented both
Woodward and Schuppan, and deployed Woodward as an informant."  (Pet'r's Br. at 12, Dkt.
No. 17.)  As the state habeas court observed, these circumstances constitute nothing more than
self-serving allegations.  This chain of speculative inferences is not enough to establish that the
state court's factual determination to the contrary was unreasonable.

Schuppan also argues that there was a conflict of interest because all three lawyers who
were appointed to represent him also represented Woodward.  To succeed on this claim,
petitioner must demonstrate that a "conflict of interest actually affected the adequacy of his
representation."  *Mickens v. Taylor*, 535 U.S. 162, 168 (2002); *see also Cuyler v. Sullivan*, 466
U.S. 335, 348 (1980).  "To establish an actual conflict of interest, the petitioner must show that
his interests diverged with respect to a material factual or legal issue or to a course of action."
*Mickens v. Taylor*, 227 F.3d 203, 213 (4th Cir. 2000), *aff'd* 535 U.S. 162.  In other words, the
petitioner "must show that there was some plausible alternative defense strategy or tactic that

might have been pursued, an alternative strategy that was inherently in conflict with or not

undertaken due to the attorney's other loyalties or interests." *Guaraldi v. Cunningham*, 819 F.2d

15, 17 (1st Cir 1978). Even assuming an actual conflict existed, "[a]dverse effect cannot be

presumed from the mere existence of a conflict of interest." *Rubin v. Gee*, 292 F.3d 396, 401

(4th Cir. 2002). Instead, the burden remains on the petitioner to demonstrate an adverse effect

on his defense. *See Mickens*, 535 U.S. at 168.

The state habeas court held as follows:

> By way of background, Simon Herr moved to withdraw as
> Schuppan's in November 2014. Bryan M. Cave, Esq., was
> appointed after Herr's motion was granted and then subsequently
> moved to withdraw as counsel on February 26, 2015. As a result,
> Richard G. Morgan, Esq., was appointed on March 12, 2015, and
> represented Schuppan during his October 2015 trial.
>
> Schuppan, without further explanation, contends "[t]hat Woodward
> . . . was a concurrent or past client of all of [his] lawyers, created
> conflicts of interest which deprived me of effective assistance."
> This unsupported claim fails to satisfy *Strickland* . . . . This Court
> holds that Schuppan fails to show a conflict of interest simply
> because his defense lawyer may have previously represented a
> witness against him.
>
> To the extent that Schuppan argues that Mr. Morgan's cross-
> examination demonstrates that Mr. Morgan recalled that he had
> previously represented Woodward, this Court holds that the record
> belies that claim. Woodward testified at length that near the time
> that Schuppan became his cellmate and before Schuppan confessed
> to Woodward, the pair realized that Simon Herr, who was with the
> Office of the Public Defender, represented Schuppan on his pending
> charges and Herr represented Woodward on his probation violation.
> Woodward testified that Schuppan "went straight to" Herr and
> suggested that Woodward could be a character witness on
> Schuppan's behalf. Woodward said that he told Herr that he did not
> want to be a character witness because Schuppan's case was "pretty
> severe" and "high profile." And then, when Schuppan subsequently
> confessed to Woodward, the conflict of interest arose.
>
> In light of Woodward's testimony about the fact that both he and
> Schuppan had been represented by Simon Herr, Mr. Morgan's

questions to Woodward ("I am not Simon Herr, correct?" and "I've never been your lawyer, correct?") were reasonable. This Court holds that it was reasonable for Mr. Morgan to confirm that Woodward had not previously misidentified Herr and to confirm that Woodward did not recall that Mr. Morgan had represented him. And to the extent that Schuppan attests that Mr. Morgan previously represented Woodward in 2011 in the Page County General District Court, he has not demonstrated that either Mr. Morgan or Mr. Woodward recalled the representation. And as stated above, he has not alleged, let alone demonstrated, how Mr. Morgan's supposed conflict of interest actually had an adverse effect on the outcome of Schuppan's case. *See Mickens*, 535 U.S. at 168.

This Court holds that Schuppan has failed to establish either an actual conflict or an adverse effect on counsel's performance. He has failed to "show that there was some plausible alternative defense strategy or tactic that might have been pursued, an alternative strategy that was inherently in conflict with or not undertaken *due to* the attorney's other loyalties or interests." *See Guaraldi*, 819 F.2d at 17 (emphasis added). Consequently, this Court holds that Schuppan has failed to establish either deficient performance or prejudice as required by *Strickland* . . . .

(Resp't's Ex. 7 at 17–19 (internal citations omitted).) Schuppan highlights what he characterizes as the "odd beginning" to cross-examination of Woodward by Mr. Morgan, confirming that he is not Simon Herr. (Pet'r's Br. at 14.) According to Schuppan, this suggests that Morgan either knew or suspected that he had represented Woodward previously, that he had failed to cross-check the identity of the Commonwealth's witnesses against his own past clients, and that he realized that he had failed to advise Schuppan that he had represented a key witness. (*Id.*) Schuppan's argument reads like the alleged conflict itself, assuming it existed, is enough to succeed on this claim. Yet as the state habeas court observed, Schuppan "has not *alleged*, let alone demonstrated, how Mr. Morgan's supposed conflict of interest actually had an adverse effect on the outcome of Schuppan's case." (Resp't's Ex. 7 at 19.) This reasoning was not contrary to, or an unreasonable application of, the Supreme Court's precedent on conflicts of interest or the standard for deficient performance and prejudice set forth in *Strickland*. Neither

was it based on an unreasonable determination of the facts.

Next, Schuppan argues that trial counsel was ineffective for not investigating favorable treatment received by Woodward during Schuppan's case, failed to cross-examine Woodward about this favorable treatment, and failed to raise that Woodward's probation violation had been dismissed after testifying.  (Habeas Pet. 11–12.)  The state habeas court rejected this claim for the following reasons:

> First, as discussed above, Schuppan's claims that trial counsel did not investigate Woodward's pending criminal charges are belied by the prosecutor's sworn affidavit wherein he states that trial counsel had reviewed Woodward's criminal file and that he had "several conversations" with trial counsel "regarding Mr. Woodward's convictions, criminal history, subsequent probation violations, and outcomes of these matters." Trial counsel told this Court that he had seen Woodward's "most recent criminal history, . . . recent as of a few days ago."
>
> Second, this Court holds that trial counsel's cross-examination strategy was reasonable. He focused on trying to show that Woodward could have learned about the content of his testimony by reading media reports of Schuppan's "high profile case." He also suggested through his questioning that Woodward could have learned the details to which he testified by reading Schuppan's private communications with trial counsel. Finally, he suggested that Woodward was biased against Schuppan because he was "repulsed . . . by the thought of the son trying to pin a murder on [his] father."
>
> Moreover, where trial counsel's investigation and Woodward's testimony demonstrated that Woodward did not receive favorable treatment in exchange for his testimony, this Court holds it was reasonable for trial counsel to avoid giving Woodward the opportunity to repeat again that he was testifying against Schuppan because "right is right" and despite the fact that Woodward believed that he would be persecuted for testifying when he returned to jail. Had counsel elicited from Woodward repeated statements regarding how he did not benefit from testifying, Schuppan would likely now be asserting that counsel was ineffective for posing these questions. *See Bunch v. Thompson*, 949 F.2d 1354, 1364 (4th Cir. 1991) (noting that because counsel is equally susceptible to allegations of ineffective assistance of counsel based on action or inaction under

certain circumstances that a habeas court should credit "plausible strategic judgments" counsel makes). Moreover, as discussed with respect to the *Brady* claim, where trial counsel was aware that Woodward had a charge pending and where it was reasonable to believe that an agreement did not exist between Schuppan and the Commonwealth, trial counsel was not unreasonable for bringing a post-trial *Brady* claim.

Moreover, where Woodward basically testified at length regarding the past dispositions he had received prior to Schuppan's trial, and where Woodward admitted that he still had a probation violation pending, this Court holds that Schuppan has failed to demonstrate that he was prejudiced by trial counsel's failure to elicit that same information.   Moreover, this Court holds that Schuppan was not prejudiced by trial counsel's failure to bring a post-trial *Brady* claim where such a claim would have been dismissed.

(Resp't's Ex. 7 at 19–20.)  This reasoning was not contrary to, or an unreasonable application of, the *Strickland* standard, and it also was not based on unreasonable factual determinations.  *See, e.g.*, Resp't's Ex. 11 at 173 (counsel stating that he had seen Woodward's criminal history), 213–14 (Woodward's testimony that he was testifying because it was the right thing to do), Dkt. No. 15-11.

Petitioner argues further that his trial counsel was ineffective because he failed to investigate Woodward being ordered to have a mental health violation.  The court rejected this claim because Schuppan did not proffer what the result of the desired investigation would have been.  This was not contrary to *Strickland* as "an allegation of inadequate investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been produced."  *Beaver v. Thompson*, 93 F.3d 1186, 1195 (4th Cir. 1996).

Finally, Schuppan alleges that he received ineffective assistance because trial counsel agreed to a joint trial with Schultz without conferring with Schuppan or advising him of his right to sever his trial.  The state habeas court analyzed and rejected this claim:

At the beginning of the criminal proceedings on October 13, 2015,

and while Schuppan was present in the courtroom, this Court asked both the Commonwealth and counsel for Schuppan and Schultz if all the parties were asking that Schuppan and Schultz be tried jointly. Both the Commonwealth and defense counsel stated that they wished for a joint trial. While discussing peremptory strikes, Schultz's counsel stated to this Court, "[W]e're not working together here, it's not a joint defense, not in any respect, and I think that each defendant should have an equal number of strikes." Schuppan's counsel joined in this argument. Schuppan's counsel further stated that "[t]he interest[s] of these two . . . co-defendants are quite opposite of each other." The Commonwealth argued that a "voluntary joinder" was before the Court, such that the co-defendants were required to split their peremptory strikes. After this significant discussion and argument that hinged on the differences between a voluntary and involuntary joinder, Schuppan did not speak up to say that he had not been advised of the difference. Rather, when asked by this Court if he was "entirely satisfied with the services of [his] attorney," Schuppan replied, "At the current time, yes, your Honor."

In any event, Schuppan fails to suggest any ground upon which counsel could have legitimately argued for separate trials. Code § 19.2-262.1 permits the joinder of trials of "persons charged with participating in contemporaneous and related acts or occurrences or in a series of acts or occurrences constituting an offense or offenses," unless a joint trial would prejudice a defendant. "A criminal defendant must show a joint trial would cause 'actual prejudice' to his rights — not theoretical or hypothetical prejudice, but rather 'legally cognizable prejudice.'" *Allen v. Commonwealth*, 58 Va. App. 618, 623, 712 S.E.2d 748, 750 (2011) (quoting *Randolph v. Commonwealth*, 24 Va. App. 345, 363-64, 482 S.E.2d 101, 110 (1997), and *Zafiro v. United States*, 506 U.S. 534, 541 (1993)). Neither the possibility that "separate trials would more likely result in acquittal," nor the assertion that a codefendant was "more deeply involved in the crime" are sufficient to entitle a defendant to severance. *Allen*, 58 Va. App. at 624, 712 S.E.2d at 751 (citations omitted).

Schuppan argues that trial counsel should have objected to joinder because the joint trial allowed "evidence damaging to, and admissible against, Schultz to be likewise damaging to my defense at trial." However, Schuppan has failed to specify what evidence that was admissible against Shultz would not have been admissible at a trial against Schuppan; thus, this Court holds he has failed to demonstrate what counsel should have argued in his objection to the joint trial. *See Sigmon*, 285 Va. at 535 36, 739 S.E.2d at 909-10;

23

*Muhammad*, 274 Va. at 18, 646 S.E.2d at 195 (finding petitioner's failure to "identify with specificity any act or omission of counsel which was objectively unreasonable" and "to demonstrate how these failures were prejudicial" fatal to Strickland claim).

And to the extent that Schuppan suggests that counsel was ineffective for failing to confer with him prior to agreeing to a joint trial, this Court holds his claim fails. Trial counsel was not required to seek Schuppan's approval as to strategic decisions about joinder and severance. Strategic determinations about severance and joinder are well-within trial counsel's area of expertise, and deference to those decisions is appropriate in habeas review. *See, e.g., McQueen v. United States*, No. 5:09-CR-00253-F-1, No. 5:12-CV-00693-F, 2016 U.S. Dist. LEXIS 12195, at *15 (E.D.N.C. Feb. 2, 2016) (finding counsel's decision to not move to sever cases was within "wide range of reasonable professional assistance" based on information available to counsel before trial, and performance was therefore not deficient); *State v. Lee*, 2018-Ohio-1523, ¶ 13, 111 N.E.3d 503, 511 (Ct. App 2018.) ("Indeed, the decision to file a motion for separate trials or to proceed with the joinder of the offenses may be a matter of counsel's trial strategy." (citations omitted)).

(Resp't's Ex. 7 at 22–24.) As before the state habeas court, petitioner argues that counsel's failure to argue against the joint trials allowed evidence damaging to, and admissible against, Schultz to be admissible against Schuppan at trial. (Pet'r's Br. at 15.) Schuppan has once again, however, failed to specify what evidence that was admissible against Schultz would not have been admissible at a trial against Schuppan. Thus, the state habeas court's reasoning that Schuppan failed to establish deficient performance under *Strickland* survives AEDPA's deferential review.

## D. Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant" on a § 2254 petition. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Petitioner has failed to make the requisite showing.  Therefore, the court declines to issue a certificate of appealability.  However, Schuppan may still ask the United States Court of Appeals for the Fourth Circuit to issue such a certificate.  *See* Fed. R. App. P. 22(b).

### III.  CONCLUSION

For the foregoing reasons, the court will issue an appropriate order granting respondent's motion to dismiss, denying Schuppan's § 2254 petition, and declining to issue a certificate of appealability.

Entered: March 4, 2024.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge